AUSA:   Adriana Dydell                    Telephone:  (313) 348-8174
Special Agent:        Tyler Goodnight     Telephone:  (313) 339-2701

AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| All Funds on Deposit in Bank of America and/or State of | ) | Case:  4:24-mc-50468-01 |
| Michigan Unclaimed Property Account Number | ) | Judge:  Kumar,  Shalina  D. |
| 375019759307 up to and including $121,777.43 | ) | Filed: 05-15-2024 |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____Michigan_____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

18 U.S.C. §§ 981(a)(l)(A), (C), 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(2)(B), 18 U.S.C. § 982(a)(l) -- All Funds on Deposit in Bank of America and/or State of Michigan Unclaimed Property Account Number 375019759307 up to and including $121,777.43

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Applicant's signature*

IRS SA Tyler Goodnight
_____
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:   May 15, 2024
_____

_____
*Judge's signature*

City and state:   Flint, Michigan
_____

Curtis Ivy, Jr.                    U. S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT FOR SEIZURE WARRANT

I, Tyler Goodnight (your affiant), being duly sworn depose and state:

1.  This affidavit is being submitted in support of seizure of the following items as property derived from or traceable to criminal proceeds and/or property involved in money laundering:

    a.  $121,777.43 from Bank of America and/or the State of Michigan-Unclaimed Property. Account 375019759307 opened in the name of Daily Dose Radio LLC by JUNE PETTIFORD and/or SAMEERAH PICKETT.

    (hereinafter, the "TARGET ITEM").

2.  I have been a Special Agent with the United States Department of Treasury, Internal Revenue Service-Criminal Investigation (IRS-CI) since July 2008. I am assigned to the Detroit Field Office. My responsibilities include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), Bank Secrecy Act laws (Title 31, United States Code), Money Laundering Control Act (Title 18, United States Code, Sections 1956 and 1957), and related offenses.

3.  During my employment with IRS-CI, I have received training and gained experience in analyzing personal and business documents and records, and in analyzing direct and indirect relationships between various types of personal and business records, documents, tax returns, and legal and illegal business activities. I have been assigned to and/or assisted other Special Agents of IRS-CI in several investigations involving the laundering of proceeds of various specified unlawful

1

activities (SUAs) such as bank fraud, wire fraud, mail fraud and the concealment of assets purchased with unlawful proceeds.

4. This affidavit only contains a summary of the relevant facts and does not include every fact known by me concerning the individuals and events described herein. The information contained in this affidavit is based on my firsthand knowledge, information obtained through interviews, from other law enforcement officers and from my review of relevant bank records and purchase records.

5. I previously conducted an investigation of SAMEERAH PICKETT (aka SAMEERAH Marrel, SAMEERAH Anderson), NOELE BROWN, and others known and yet unknown to law enforcement.

6. I initiated an investigation, queried and reviewed law enforcement and proprietary databases, conducted interviews, received and reviewed documents from various financial institutions and the Michigan Secretary of State, conducted surveillance, reviewed 3rd party records, and have spoken with other law enforcements officers with personal knowledge.

7. The investigation of this matter revealed that SAMEERAH, BROWN, and others, were involved in the filing of false Forms 1041 US Income Tax Returns for Estates and Trusts in violation of 18 U.S.C. § 286, 287, 641, and 1028A. Some of these trusts were prepared using individual's personal identifiable information (PII) without their consent. SAMEERAH had also filed false tax returns in multiple

2

states allowing her to receive multiple large fraudulent tax refunds. In connection with SAMEERAH's filing of false tax forms, I believe that SAMEERAH had acquired substantial amounts of proceeds from the fraudulent federal tax return filings.

8.  As more fully detailed herein, SAMEERAH obtained criminal proceeds, and moved these proceeds through one or more bank accounts. Based on the information set forth below, there is probable cause to believe that the TARGET ITEM constitutes proceeds of illegal activity and/or is traceable to the proceeds of illegal activity, specifically theft of public money, mail fraud, wire fraud and identity theft, in violation of Title 18, U.S.C. § 641, 1028, 1341, and 1343. There is also probable cause to believe that SAMEERAH concealed the criminally derived proceeds in violation of 18 U.S.C. § 1956(a)(l)(B)(i) and transferred the funds in violation of 18 U.S.C. § 1957; thus, the TARGET ITEM constitutes proceeds and/or property involved in money laundering making it subject to criminal forfeiture under 18 USC § 982(a) and to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

## MONEY LAUNDERING

9.  Based on my training, experience, and participation in financial investigations involving the concealment of funds and assets in order to prevent detection by law enforcement agencies, I have observed that individuals involved in illegal activities

3

will often engage in one or more of the following activities in an effort to conceal or disguise the nature, location, source, ownership or control of proceeds of unlawful activity: (a) incorporating shell companies; (b) receiving the proceeds of unlawful activity in corporate, rather than personal, bank accounts; (c) opening multiple bank accounts for a single entity; (d) moving the proceeds of unlawful activity to different accounts; (e) opening and closing bank accounts.

10. Further, individuals involved in illegal activities often commingle their criminal proceeds with legitimate funds in bank accounts or other financial accounts in order to conceal the illegal source of their criminal proceeds. Commingling is the act of mixing illegally obtained funds with legally obtained funds, so that the legally obtained funds act as a cover and reduce suspicion concerning the tainted funds. Commingling illegally obtained funds with legitimate funds in a bank account to conceal or disguise the location, source, ownership, or control of the illegally obtained funds, taints the entire bank account and makes all of the funds in the commingled account subject to seizure and forfeiture.

11. Collectively, the above described methods that criminals use to conceal the nature, source, ownership, control, and location of their criminal proceeds or to further their criminal activity may be referred to as "money laundering." Money laundering is a crime under the following statutory provisions:

   a. 18 U.S.C. § 1956(a)(1)(B)(i) makes it a federal offense for anyone, knowing that property involved in a financial transaction represents the

4

proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

b. 18 U.S.C. § 1957 makes it unlawful for any person to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 if the property is in fact derived from specified unlawful activity.

## APPLICABLE FORFEITURE STATUTES

12. Under 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" is subject to civil forfeiture. In addition, 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461 provides for criminal forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity. The definition of "specified unlawful activity" includes violations of 18 U.S.C. §§ 641, 1028, 1341, and 1343 under 18 U.S.C. § 1961(1)(B) and/or 18 U.S.C. § 1956(c)(7).

13. Furthermore, when the property in a civil forfeiture action consists of funds deposited in an account at a financial institution, 18 U.S.C. § 984 provides for the civil forfeiture of any identical funds found in the same account as the funds involved in the offense that is the basis for forfeiture.

14. Under 18 U.S.C. § 981(a)(1)(A) any property, real or personal, involved in a

transaction or attempted transaction in violation of section 1956, 1957, or 1960, or any property traceable to such property is subject to civil forfeiture. Similarly, 18 U.S.C. § 982(a)(1) provides for criminal forfeiture of any property involved in, or traceable to property involved in, a violation of 18 U.S.C. §§ 1956, 1957, or 1960.

15. To the extent the seizure warrant is being requested pursuant to criminal forfeiture statutes, there is also probable cause to believe that a protective order pursuant to 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the TARGET ITEM for criminal forfeiture due to the dangers inherent in the movement of electronic funds.

16. Title 18 U.S.C. § 981(b)(3) authorizes the issuance of a seizure warrant in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b), and may be executed in any district in which the property is found. Title 28 U.S.C. § 1355(b) authorizes the filing of a forfeiture action in the district court for the district in which any of the action or omission giving rise to the forfeiture occurred.

## PROBABLE CAUSE FOR SEIZURE

17. In or about February 2016, I received information from the IRS Scheme Development Center [SDC] which had identified a number of false and fraudulent Forms 1041 U.S. Income Tax Return for Estates and Trusts filed with the IRS for the tax years 2013 to 2017. These returns were all identified as fraudulent because

the returns claimed that the IRS had withheld large amounts of income tax from the trusts purportedly filing the returns, and that those trusts were therefore entitled to large refunds of the excess income tax withheld. In fact, with respect to each of the returns I was tasked to investigate, IRS records showed that the IRS did not withhold anything at all related to these trusts', and that they were therefore entitled to no refund of any kind. Altogether, the SDC referred 122 such Forms 1041 to me for further investigation after having determined that they falsely reported withholdings and claimed refunds totaling $13,690,341.00. These returns were filed with the IRS from March 22, 2014 to July 19, 2018 for tax years 2013-2017. The IRS, before recognizing the fraudulent nature of the returns, actually paid out a total of $5,539,049.28 based on these claims. Since July of 2018, numerous additional returns have been filed and refunds from those returns have been issued and deposited into banks.

18. The SDC linked these 122 returns to one another in various ways to establish that they were filed as part of a common scheme, perhaps by the same person or persons. They found commonalities in the trust and trustee names and addresses used and other common characteristics such as Forms 1099 from the same "Payer" submitted with the returns, as well as listing common return preparers on some trust returns.

## **FRAUDULENT FEDERAL TAX RETURNS**

19.   My analysis of the 122 returns first confirmed that the returns were indeed related and filed as part of a common scheme, and second identified SAMEERAH, BROWN, and others as the individuals responsible for filing these false returns. Of the 122 returns, 106 were prepared in paper form and then mailed to the IRS, while 16 returns were electronically prepared and transmitted to the IRS.

20.   These returns were filed from January 30, 2015 to March 02, 2016. The IP addresses used to file these returns were recorded by the IRS upon filing, and I obtained IRS records containing IP addresses used to file them.

21.   These 16 electronically filed trust tax returns used four different IP addresses to transmit the returns to the IRS. I obtained and reviewed records from the internet service providers [ISPs] and determined that two of the IP addresses used to file the fraudulent trust returns had been assigned to SAMEERAH as the subscriber at the time of filings. More specifically:

   a.   AT&T was the ISP for two of the IP addresses and, according to its records, these IP addresses (99.59.39.123 and 104.184.20.170) were both assigned to SAMEERAH's AT&T account when the returns were filed with these IP addresses. These two IP addresses were used to file five returns, fraudulently seeking $274,970.00 in refunds.

   b.   AT&T also provided the physical addresses where these two IP addresses were assigned: 23384 Cornerstone Village Dr, Southfield, MI and 5460 Olivia Michal Place Apt 106, Westerville, OH. I noted that both of these addresses were also used on five of the trust tax returns as the address of the trusts filed pursuant to the scheme.

8

c. The IP address 104.184.20.170 was used to file two returns. These returns were analyzed and revealed that two refund checks were issued and deposited into two separate Huntington Bank Accounts. My review of these Huntington Bank records revealed the accounts were opened by a person identified as SAMEERAH on December 30, 2014 and March 04, 2015.

d. The records for the other two IP addresses used to file 11 returns were unavailable. However, those 11 returns were analyzed and revealed that both IP addresses were used to file returns that resulted in three refund checks being issued and deposited into three separate Huntington Bank accounts. My review of these three Huntington Bank records revealed the accounts were opened by a person identified as SAMEERAH on March 04, 2015, May 13, 2015, and September 26, 2015.

e. Altogether, the 16 electronically filed false returns requested refunds totaling $876,920.00, of which $299,386 was paid out in six refund checks. Five of these refunds went into Huntington Bank accounts opened by SAMEERAH, according to bank records I obtained and reviewed. She was the sole signatory on those accounts, and a large portion of the funds were removed from these accounts and spent after their deposit.

f. The AT&T IP address 104.184.20.170 was also used to transmit SAMEERAH's 2014 Form 1040 US Individual Income Tax Return, according to IRS records I reviewed.

g. I reviewed bank surveillance videos provided by Huntington Bank for four of SAMEERAH's accounts referenced in subparagraphs 21(c) and (d), above. My review showed the same woman accessing (making withdrawals and deposits) all four of these accounts. I compared the woman in the videos with the Michigan Driver License photo of SAMEERAH and found them to be the same person. During the review of the surveillance videos, I was able to see SAMEERAH deposit multiple refund checks derived from some of the 122 returns I analyzed into her accounts at Huntington Bank, as more specifically described below.

h. From the 16 electronically filed returns, two of the refund deposits were captured on video. On 03/09/2015, video surveillance and corresponding

bank records show SAMEERAH filling out a deposit slip and handing the teller a refund check (Lucid Communication Trust - $62,010.00) to be deposited it into her account xxx9664 in the business name of Lucid Communications. That return was filed using SAMEERAH's AT&T IP address 104.184.20.170. On 10/26/2015, video surveillance shows SAMEERAH hand a refund check (Clean Sweep Properties - $65,019.00) to a Huntington employee for deposit into her account xxx1185 in the business name Clean Sweep Properties. The return was filed using IP address 68.41.39.84.

i.   While reviewing the Huntington Bank surveillance videos, SAMEERAH can be seen depositing two other refund checks into her accounts. On 10/23/2015, SAMEERAH can be seen at a drive thru teller window depositing a refund check (For Weaves Only Distributors Trust - $31,111.00) into her account xxx0070 in the business name of For Weaves Only. On 10/16/2015, SAMEERAH can be seen depositing a refund check (Lucid Communications Tech Trust - $57,234.00) into her account xxx9664 in the name of Lucid Communications.

22.   Of the remaining 106 returns that were filed in paper form by mailing them to the IRS, I was able to identify, by reviewing IRS and banking records, 20 trust tax refund checks that were deposited into accounts opened by SAMEERAH. Those 20 trust tax refunds totaled $1,345,406.69 and were issued between 12/29/2014 and 09/04/2017. The related trust tax returns were filed from 11/15/2014 to 08/05/2017.

23.   My investigations disclosed that SAMEERAH opened at least 29 bank accounts during the period 2014 to 2018. A review of the bank records pertaining to those accounts determined that:

a.   14 of those accounts had 25 fraudulent trust tax refund checks directly deposited into them (issued as a result of the filing of some of the 122 returns I was looking into).

b. An additional eight of those 29 accounts received money derived from some of the 122 fraudulent refunds from transferring a portion of the refund proceeds from the accounts into which they were initially deposited.

c. One of these trust tax refunds deposited into an account opened by SAMEERAH was in the name of a trust using the name of an individual whose initials are AK as trustee, who claims to be an identity theft victim. The AK name is connected to five different fraudulent trust returns, resulting in the issuance of three refunds, discussed in more detail below.

d. There were a total of 5 false trust tax returns filed using AK's name requesting $2,477,652 in refunds, resulting in the release of fraudulent refunds totaling $462,601. My review of federal tax and banking records revealed that two of those refunds were deposited into a Huntington Bank account xxx4197 opened online in AK's name, which AK stated she did not open. All activities for the account were done online, through the ATM, or using drive-through windows. Numerous checks were written from the Huntington account and deposited into accounts in the names of SAMEERAH and "June Pettiford". One cashier's check for $17,003.55 was written from the AK account to LJB Automotive LLC, which, according to official records filed with the State of Michigan, is a company registered to SAMEERAH.

e. The bank records I reviewed also revealed multiple transactions between SAMEERAH's accounts and accounts in the name of an individual June Pettiford. These transactions occurred after fraudulent trust tax refunds were deposited into the June Pettiford accounts.

f. On May 04, 2018, IRS-CI Special Agents interviewed June Pettiford (Pettiford) about the refunds and returns. Pettiford claimed to be a victim of ID theft, and said that she did not give SAMEERAH permission to set up trusts or file any tax returns in her name.

g. During the investigation, I also obtained a copy of an Ohio driver license in the name of June Pettiford, issued on 03/03/2016. Although the license was in the name of Pettiford, it contained a photograph of a person I recognized to be SAMEERAH, based on my review of a Michigan driver

11

license in her name as well as internet and social media content I reviewed. Based on bank records and witness interviews, this identification was used by SAMEERAH to open bank accounts, rent apartments, open a UPS Box, and to purchase expensive items like jewelry and vehicles.

h. My review of the 122 tax returns and related tax and bank records obtained in the course of the investigation showed that, from July 17, 2017 to May 31, 2018, a total of 8 fraudulent trust tax refunds were deposited into accounts in the name of June Pettiford, requesting refunds of $1,061,473.00 with $1,066,332.77 actually refunded (interest was added to two refunds). In addition, from March 02, 2016 to September 30, 2017, 14 more trust tax returns using the name of June Pettiford or signed using a signature with the name June Pettiford were filed, requesting an additional $1,600,830.00 in refunds. These 14 additional requested refunds were not paid, however. All 22 Forms 1041 were filed for tax years 2015, 2016 or 2017.

i. SAMEERAH's IP address 99.59.39.123 was used on March 02, 2016, to file a 2015 electronic return that lists June Pettiford as the trustee. This return requested a refund of $62,457.00 but was not released.

24. On September 10, 2018, another IRS-CI agent and I interviewed an individual whose initials are CH about her name being used on a Form 1041 Trust Tax Return filed in the name "CH Trust" which was filed with the IRS on July 8, 2017. This Trust Tax Return falsely reported excess tax withholdings and claimed a refund of $51,236.00. CH indicated during the interview that she has been best friends with BROWN since she was 13 years old. CH stated BROWN and SAMEERAH were very close friends. Around mid-2017, BROWN told CH that SAMEERAH knew how to apply for grants, and SAMEERAH was willing to help CH apply for a business grant. CH gave BROWN her name, and PII, including her Social Security

12

Number and Date of Birth. BROWN told CH that BROWN gave her PII to
SAMEERAH. SAMEERAH later told CH that her name would be put into a pot
and the winner would get the grant money. CH was not told how much the grant
would be or how much she would have to pay SAMEERAH.

25.     CH further advised the interviewing agents that CH later received a check from the
IRS for $51,236.00. The check had CH's name on it, so CH deposited it into CH's
Chase Bank account. After letting the check clear, BROWN instructed CH to get a
cashier's check for $28,975.00 and have it put into the name of SAMEERAH's
business, "Clean Sweep Properties LLC". CH searched a state website and found
that SAMEERAH was the Resident Agent for the business, so it appeared
legitimate. CH gave the cashier's check to BROWN, and believes BROWN gave
the check to SAMEERAH. CH did not sign the Form 1041 Trust Tax Return
shown to CH, nor give anyone permission to sign CH's name to any forms. CH
noted that whoever signed her name on the return spelled it wrong. If CH would
have been told that a tax return was going to be filed, CH would not have been
okay with it. CH stated BROWN is someone she trusted, and CH knew BROWN
had applied for a grant in the past.

26.     CH questioned BROWN and SAMEERAH about the process and asked if CH
would have to pay taxes on the money, but BROWN and SAMEERAH assured
CH would not. CH knows through discussions that BROWN had referred other

13

people and would get a portion of the money. CH also knows through discussions with BROWN that BROWN and SAMEERAH rented a yacht in 2018. According to bank records I reviewed, the cashier's check written from CH to "Clean Sweep Properties" was deposited into a 5/3 Bank account in the name of "Clean Sweep Properties LLC," which I confirmed through official public records was a business registered by SAMEERAH on 10/26/2015. The cashier's check was endorsed by SAMEERAH at the time of deposit. This 5/3rd Bank account also received a trust tax refund in the name "Properties Sweep Clean Trust."

27. An individual whose initials are LC was interviewed by IRS-CI agents on May 24, 2018 and advised them that he met BROWN through a mutual friend whose initials are RW who was dating BROWN at the time. BROWN later introduced LC to "Crème" who he identified as SAMEERAH through a photograph. LC met with SAMEERAH one time, talked to her once on the phone, and the remainder of his contacts were with BROWN and RW. Around July of 2017, BROWN contacted LC and told him that SAMEERAH worked for the IRS, so she knew all the loopholes and had an opportunity to get LC some money. Over a three-way phone conversation, BROWN and SAMEERAH explained to LC that they only needed his name and address and they did not need his date of birth or Social Security Number. LC provided his and his wife's names and addresses but did not sign any forms or authorize them to sign any forms for him. LC was told he should expect

14

to get a check for between $50,000 and $100,000, and that he would get to keep $15,000.

28.   Tax records show that the IRS received two Forms 1041 Trust Tax Returns linked to LC and his wife, BC, on July 11 and 12, 2017, respectively, and both returns requested a refund of $78,516.00. LC said he received a call from BROWN stating the checks were on the way, and he needed to open a new bank account at either Chase or Huntington Bank. LC received two refund checks, one for each trust tax return filed with the IRS, on August 14 and 15, 2017. BROWN told LC he was not allowed to deposit both checks into the same bank account. LC opened an account at Huntington Bank, signed the refund check for both him and his wife, and deposited the $78,516.00 refund check into the new account. After the check cleared, LC called RW. LC advised that it was clear to him that RW was with BROWN during this call, and that BROWN was directing RW what to say.

29.   LC indicated to interviewing agents that, on 08/21/2017, BROWN and RW instructed him to obtain a cashier's check in the name "Level Ten Promotions LLC" in the amount of $47,858.11 and give it to them. LC got the cashier's check and gave it to BROWN and RW in the parking lot at LC's work.

30.   LC advised agents that he and his wife received and signed the second IRS refund check for $78,516.00, and LC deposited it into a new Huntington account opened in his wife's name. On 08/24/2017, Brown directed LC to obtain a cashier's check

for $47,905.35 in the name "Luxley Luxury Group LLC." LC did so and believes

he gave RW and BROWN this check as well. LC remembers two later occasions

when BROWN requested that LC withdraw funds from the new accounts. On each

occasion, he obtained a cashier's check for $15,000 payable to "Lucid Event

Promo" as instructed. One of those times, LC gave the money to RW and

BROWN, and the other time he gave the money to RW alone.

31.   LC claimed that LC and BC did not know a Form 1041 Trust Tax Return was

going to be filed to produce the refund checks in question. Neither LC nor BC

signed the tax returns or gave anyone permission to sign their names to the tax

returns. I interviewed BC on November 9, 2018, and she confirmed that she had

not seen the 1041 Trust Return, and that her signature was a forgery.

    a.   According to 5/3 Bank records I obtained and reviewed, the two $15,000
        cashier's checks written to "Lucid Event Promo" were deposited into a
        5/3rd Bank account in the name of "Lucid Event Promo LLC" opened by
        BROWN (this account also received a trust tax refund in the name of
        "Brown Nicole Noelle Trust").

    b.   The cashier's check to "Level Ten Promotions LLC" for $47,858.11 was
        deposited into a Bank of America account in the name of "Level Ten
        Promotions LLC" opened in the name of June Pettiford (this account also
        received a trust tax refund in the name of "Level Ten Promotions Trust").

    c.   The cashier's check to "Luxley Luxury Group LLC" for $47,905.35 was
        deposited into an unknown bank and account but was signed by
        SAMEERAH and stated "Luxley Luxury Group LLC" under the
        endorsement.

32.   My investigation revealed 10 Forms 1041 Trust tax returns, of the 122 I originally

reviewed, were linked to BROWN by either being in her name or signed by "NOELLE BROWN". These returns requested a total of $2,340,734.00 in refunds, with $2,100,065.12 being issued by the IRS through six refund checks. Some of the funds were frozen by the banks and are in the process of being returned to the IRS. According to tax and bank records I reviewed, four of these refunds went into accounts opened by NOELLE BROWN, and two others went into accounts opened in the name of June Pettiford.

33. On or about August 1, 2022, the United States filed an Information against Sameerah Marrell, aka "Sameerah Anderson," aka "Sameerah Pickette," aka "Crème," aka "Loren Boyd." The case was assigned case number 2:22-cr-20419 and assigned to Hon. Stephen J. Murphy, III. The Information contained charges for Mail Fraud, Wire Fraud and Committing an Offense While on Bond.

34. On or about January 11, 2023, Sameerah Marrell pleaded guilty to all three counts of the Information in a Rule 11 plea agreement. In the factual basis of her plea agreement, Sameerah agreed that she filed and caused the filing of 122 false and fictitious Forms 1041 (Income Tax Returns for Estates and Trusts) seeking $13,690,341 from the IRS which neither she nor her accomplices nor the entities in whose names the returns were submitted were entitled to. Before discovering the fraud, the IRS paid out a total of $5,539,049 based on Ms. Marrell's spurious claims. Judgment was entered against Marrell on or about February 24, 2023. The

17

Judgment included over $5 million in restitution to the IRS.

## Financial Investigation

## Bank Accounts

35. Review of the following bank accounts revealed that each of the accounts is tied to fraudulently obtained funds.

## Bank of America account 375019759307

36. Bank of America account 375019759307 was opened in the name of "Daily Dose Radio LLC" on 01/11/2018.

37. On or around January 27, 2017, a false 2016 Form 1041 Trust Tax Return in the name of "Daily Dose Radio Co Trust" was received by the IRS requesting a refund of $117,339.00.  It was determined to be false, based on the fact that no withholdings were received by the IRS and no refund should have been released. However, a refund check in the same trust name and a trustee of June Pettiford for $120,439.55 was mailed on December 19, 2017, this was for the amount requested plus interest of $3,100.55. That $120,439.55 refund check was deposited into Bank of America account 375019759307 on January 26, 2018.

   a. The address used on the check can be tied back to an address SAMEERAH utilized.

   b. The signature on the check appears to be the signature SAMEERAH used to sign June Pettiford's name.

38. On January 25, 2018, there was a $2,000.00 transfer into account 375019759307

from Bank of America account ending 488062269003 in the name of June Pettiford.

39. On February 13, 2018, Bank of America closed account 375019759307 with a balance of $121,777.43.

## Bank of America account 488062269003

40. Bank of America account 488062269003 was opened on April 14, 2016 in the name of "June Pettiford" by SAMEERAH MARRELL. SAMEERAH used a fake Ohio driver's license in the name of June Pettiford to open the account. This fake driver's license was in the name of Pettiford but used a picture of SAMEERAH.

41. On or around June 26, 2017, a false 2016 Form 1041 Trust Tax Return in the name of "Pettiford E June Trust" was received by the IRS requesting a refund of $51,825.00. It was determined to be false, based on the fact that no withholdings were received by the IRS and no refund should have been released. However, a refund check in the same trust name for $51,825.00 was mailed on November 21, 2017. The refund check was deposited into Bank of America account 488062269003 on December 08, 2017.

42. On January 25, 2018, $2,000.00 was transferred to Bank of America account 375019759307 (discussed above in paragraphs 36-39).

43. June Pettiford was interviewed and asked specifically about Bank of America accounts 375019759307 and 488062269003. Pettiford stated she did not open

either of the accounts and did not know anything about them.

## CONCLUSION

44. Based on the information contained herein there is probable cause to believe that SAMEERAH derived criminal proceeds from violations of 18 U.S.C. §§ 641, 1028, 1341, and 1343, and that SAMEERAH and others, laundered the criminal proceeds through the bank accounts, and then used those laundered funds in violation of 18 U.S.C. §§ 1956 and 1957.

45. There is probable cause to believe that the TARGET ITEM constitutes proceeds traceable to violations of 18 U.S.C. § 641, 1028, 1341, and 1343; and/or 18 U.S.C. §§ 1956, 1957 (Money Laundering) and is, therefore, subject to seizure and civil forfeiture under 18 U.S.C. §§ 981(a)(l)(A), (C), and/or seizure and criminal forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(2)(B),and 18 U.S.C. §§ 982(a)(l) and/or constitutes property involved in, or traceable to property involved in Money Laundering in violation of 18 U.S.C. §§ 1956, 1957 and is, therefore, forfeitable civilly pursuant to 18 U.S.C. § 981(a)(l)(A), and criminally pursuant to 18 U.S.C. § 982(a)(l).

46. There is probable cause to believe that the TARGET ITEM would, in the event of a criminal conviction, be subject to forfeiture and that, because the TARGET ITEM is liquid and transferrable, a protective order would not be

20

sufficient to assure the availability of the TARGET ITEM for forfeiture.

47.    There is probable cause to believe that the TARGET ITEM can be forfeited in

the Eastern District of Michigan because SAMEERAH filed the tax returns

from the State of Michigan where she was living at the time, and the refund

checks were both mailed to addresses in the State of Michigan as well. Federal

law provides for the issuance of seizure warrants by any judicial district where

a forfeiture action against the property may be brought: "Notwithstanding the

provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure

warrant may be issued pursuant to this subsection by a judicial officer in any

district in which a forfeiture action against the property may be filed under

section 1355(b) of Title 28, and may be executed in any district in which the

property is found... "18 U.S.C. § 98l(b)(3).

48.    Based on the information contained in this affidavit, I respectfully request that a

warrant be issued to seize, for civil and/or criminal forfeiture, the following

TARGET ITEM:

   a.   $121,777.43 from Bank of America account 375019759307 opened by
        SAMEERAH PICKETT using the name June Pettiford.

49.    I request permission to serve the seizure warrant electronically followed by

original service, which personal service may be waived by the recipient.

_Tyler Goodnight_

_____
Tyler Goodnight
Special Agent,
IRS- Criminal Investigation

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_____
Honorable Curtis Ivy, Jr.
United States Magistrate Judge

Dated:  May 15, 2024

22

AUSA:  Adriana Dydell          Telephone:  (313) 303-4261

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture   Special Agent:          Tyler Goodnight          Telephone:  (313) 399-2701

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>All Funds on Deposit in Bank of America and/or State of<br>Michigan Unclaimed Property Account Number<br>375019759307 up to and including $121,777.43 | )<br>)<br>)<br>)<br>) |

Case: 4:24-mc-50468-01
Judge: Kumar, Shalina D.
Filed: 05-15-2024

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ Eastern _____ District of _____ Michigan _____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

All Funds on Deposit in Bank of America and/or State of Michigan Unclaimed Property Account Number 375019759307 up to and including $121,777.43 with permission to serve the warrant electronically followed by original service.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before  May 29, 2024 _____
                                                                                                              *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.        ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to the presiding United States Magistrate Judge on duty _____ .
          *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days (not to exceed 30)        ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  _____ May 15, 2024    11:24 am _____          _____
                                                                                                  *Judge's signature*

City and state:   _____ Flint, MI _____          Curtis Ivy, Jr.          U. S. Magistrate Judge
                                                                          *Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*